UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM PHILLIPS,

        Plaintiff,

v.

SGT. NEIDY, ET AL.,

        Defendants.

_____/

Case No. 10-14982

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [40] AND DENYING
PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT ON CLAIMS
OF UNREASONABLE SEIZURE AND EXCESSIVE FORCE [42]**

This civil rights action, alleging Fourth and Fourteenth Amendment violations, is brought pursuant to 42 U.S.C. § 1983. It arises out of Plaintiff's encounter with Taylor police officers in the early morning hours of December 16, 2007, and comes before the Court on Defendants' motion for summary judgment and Plaintiff's cross motion for partial summary judgment on his unreasonable seizure/excessive force claims. Plaintiff's original complaint was filed on December 16, 2010 against Defendants Sergeant Neidy, Officer Thivierge, Corporal Yobak, Public Service Officer Catherine Wright-Volante,[1] and eight "John Doe" Defendants. Plaintiff's state law claims and Fifth Amendment claims were dismissed without prejudice, and Plaintiff was ordered to file an amended complaint. (Doc. No. 3, 1/31/11 Order.)

_____

[1]Improperly named as "F.N.U. Volant."

Plaintiff's second amended complaint was filed on February 14, 2012, adding nine new Defendants in place of previously unknown "John Doe" Defendants -- Defendants Lt. Tonge, Lt. Zieleniewski, Sgt. Cullen, Sgt. Culp, Sgt. Kronexl, Sgt. Anthony, Sgt. Schindler, Sgt. Witherspoon and Cpl. Michowski [27]. It alleges that (1) all Defendants, with the exception of Defendant Wright-Volante, violated his Fourth Amendment rights when they unreasonably seized and used excessive force on him on December 16, 2007 (Count 1); (2) Defendants Wright-Volante, Neidy, Tonge, Zieleniewski, Cullen, Culp, Kronexl, Anthony, Schindler, Witherspoon, and Michowski violated his Fourth and Fourteenth Amendment rights by being deliberately indifferent to his serious medical needs and subjecting him to cruel and unusual punishment; and (3) Defendants Wright-Volante, Zieleniewski, Cullen, Culp, Kronexl, Anthony, Schindler, Witherspoon, and Michowski conspired to violate Plaintiff's civil rights in violation of 42 U.S.C. § 1988 [sic].

For the reasons stated below, (1) all claims asserted against the nine new Defendants named in place of previously unknown "John Doe" Defendants are dismissed with prejudice because they are barred by the relevant statute-of-limitations; (2) Plaintiff's claims of unreasonable seizure and excessive force against Defendants Neidy and Yobak are dismissed because probable cause existed for his arrest and because their use of force was objectively reasonable under the circumstances; (3) Plaintiff's claims of deliberate indifference against Defendants Neidy and Wright-Volante are dismissed; (4) Plaintiff's civil rights conspiracy claims are dismissed; (5) because genuine issues of material fact exist as to Plaintiff's claims of excessive force against Defendant Thivierge, limited to his claims that Thivierge allegedly kicked him once in the ribs when he was on his knees with his hands on his head and allegedly kicked him once in the stomach when he was curled over

2

from the initial kick,  Defendants' motion for summary judgment is denied as to this limited claim; and (6) Plaintiff's cross-motion for partial summary judgment on claims of unreasonable seizure are denied.  Thus, the only issue remaining for trial is the limited excessive force claim against Defendant Thivierge.

**I.    Facts**

The salient facts are in dispute.  First, Plaintiff's version.

Plaintiff is familiar with law enforcement and the state judicial system, having been arrested, jailed, and paroled numerous times.  (Defs.' Mot., Ex. A, Pl.'s Dep.)  On the date of the incident that gives rise to this lawsuit, December 16, 2007, Plaintiff admits that he was driving a pick-up truck that did not have proper plates, that he was driving without a valid driver's license, and that he fled from the police despite repeated commands for him to stop running.   (Pl.'s Dep. at 70, 81, 83-85, 159, 177-78, 184-85.)

About 12:30 a.m. on December 16, 2007, Plaintiff got a call from his friend Chris Cotton to come pick him up from a local bar and take him to his car.  Plaintiff agreed to do it.  Driving conditions were not good, it had been and was still snowing with about eight inches on the ground.  The roads were slippery and visibility was poor.  After getting his friend from the bar, Plaintiff drove toward the friend's parked car.  He was driving under the speed limit and stopped at all stop signs.  When he was about an eighth of a mile from his destination, Plaintiff heard a sound that made him think the pick-up truck's serpentine belt was going bad and pulled over.  (Pl.'s Dep. at 157-163.)

Plaintiff was standing in front of the pick-up truck with the hood open when, after about 15 seconds, a fully-marked police car pulled up behind his truck and put its lights on.  He closed the hood.  His friend was still seated in the passenger seat.  Plaintiff saw only one

3

officer whom he was unable to identify.  The officer exited the vehicle, walked up to Plaintiff, twice calling him "Shawn," his brother's name.  He did not have his gun drawn.  Plaintiff replied "I'm not Shawn."  The officer then told him to put his hands on the closed truck hood.  He did so, but then removed his right hand off the hood of the truck to grab his I.D.  (Pl.'s Dep. at 162-169.)  When Plaintiff removed his hand from the hood and reached for his wallet from his back pocket, the officer used his open hand and pushed Plaintiff's head onto the hood of the truck, telling Plaintiff "I told you not to move."  The left side of his face was now on the hood.  The officer started spraying him with mace, and so he turned his head toward the officer and tried to cover his face with both hands.  The officer told him not to resist.  This was all happening quickly -- less than 30 seconds.  Plaintiff then took off on foot, running.  (Pl.'s Dep. at 170-177.)

Plaintiff took off running as fast as he could through snow-covered side streets, front and back yards of residential homes, hopping fences, trying to make it to Campbell Street where his friend's car was parked and where another friend lived.  One officer, whom Plaintiff cannot identify, was chasing him through those yards and over those fences, telling Plaintiff to stop numerous times.  Plaintiff did not stop until he made it to what he thought was Campbell Street.  He was coming off the sidewalk, getting ready to cross the street when he saw two police cars approaching him from different directions.  Plaintiff stopped in the middle of the street, dropped to his knees, and put his hands on the top of his head.  This was about 10 to 15 minutes after he fled from the police.  (Pl.'s Dep. at 177-182, 184-86.)

Two officers from one vehicle approached Plaintiff, walking fast.  One officer walked up and kicked Plaintiff, who was on his knees, once on the right side of his ribs.  Plaintiff

4

fell to his side, removed his hands from his head and curled up like a ball to protect himself. One of the officers kicked him the second time in the stomach, and he had a bowel movement. He testified that the officers used their hands and feet to punch him in the back of the head and to kick him in the upper torso, stomach, side and back about three to five times. One officer put a boot on the side of Plaintiff's face and would not let him up. The officers told him to quit resisting. Plaintiff told them that he was not resisting and to stop, but admits that he moved from his knees to laying on the ground on his side and moved his hands from his side to the front of his body to protect himself. This struggle took about 30 seconds. The officers then handcuffed him, went through his pockets, and put him in the back of a police car. Plaintiff was still cussing at the officers, telling them that they got the wrong person, that he was not Shawn. The officers cussed back and told him to shut up. After Plaintiff was handcuffed, no one kicked, punched, slapped, or pushed him. Plaintiff is unable to identify any of the officers that he claims punched or kicked him. (Pl.'s Dep. at 182-198.)

Plaintiff was taken to the Taylor Police Department. There, officers searched him, removed his sweatshirt and boots, and placed him in a cell. He told an unidentified officer that he needed medical attention, and the Taylor paramedics showed up and treated him within 30 minutes to an hour. The paramedics told him that he should go to the hospital for further X-rays because he was complaining of severe pain in his rib area and the side of his back. The paramedics also told him that a lieutenant on duty would transport him to the hospital. Plaintiff was then placed in a jail cell. At an officer's request, he took off his shirt and gave it to the officer. After being placed in the cell, Plaintiff was not threatened by another and did not have any physical contact with any officers. Plaintiff lost track of

5

time until he was called out of his cell to speak with attorney William Hackett, who his mother retained on his behalf. He told the attorney that he was supposed to be transported to the hospital but this was not done. A short time after speaking with his attorney, an officer came to Plaintiff's cell and told him they were taking him to the hospital. He was taken to the hospital on December 18, 2007, without his shirt or shoes and in handcuffs. (Pl.'s Dep. at 198-206.) Plaintiff had X-rays, was informed that his ribs were bruised but not broken, and he was given a prescription for Vicodin. After that, he was taken back to the police station. He remained there in a cell until he was arraigned on December 19, 2007. He was released after his mother posted bond for him. (Pl.'s Dep. at 206-211.) Plaintiff claims his injuries from this December 16, 2007 encounter with the Taylor police include bruised ribs, a black eye, cut and swollen nose, and bruised left side of his face. None of the injuries left scars, all healed within a week or two, and he did not miss any work. (Pl.'s Dep. at 137-40.)

A Wayne County EMS Run Report shows that EMS was called to the Taylor jail at 2:07 a.m. on December 16, 2007 and arrived 2 minutes later. Plaintiff was sitting in a cell. He had a small laceration on his nose, there was blood on him, but the bleeding had stopped. He complained of pain on his left side. Plaintiff told EMS that he got his wounds from the police after fleeing from them. Although the EMS advised the Lieutenant on duty that Plaintiff needed further evaluation, he refused to allow EMS to immediately transport Plaintiff to the hospital and said the Taylor police would do it. (Pl.'s Resp., Ex. 2, EMS Run Rpt.) Generally, the Taylor police station supervisor in charge at the time would make decisions whether EMS or a police car would transport a pretrial detainee to the hospital for medical attention. Factors considered in that determination include whether the pretrial

6

detainee was combative or an escape risk and the severity of the crimes charged. (Defs.'
Mot., Ex. H, Sgt. Cullen Dep. at 31-33; Lt. Zieleniewski Dep. at 18-20, 33-34.)

Plaintiff was transported to Oakwood Hospital Heritage Center in Taylor on December
18, 2007. His chief complaint was pain on the right side of his ribs. He was in and out of
the hospital in about two hours. He was diagnosed with contusions on the ribs and face,
and his discharge instructions were to follow up with his primary care doctor if needed or
to return to the ER if his condition worsened. There is no notation of a prescription for
Vicodin or anything else. (Defs.' Mot., Ex. K, Hosp. Rec.)

Christopher Cotton, the passenger in Plaintiff's car, was also arrested on December
16, 2007 for having an open bottle of beer in the car. (Pl.'s Resp., Ex. 6, Cotton Dep. at
27-29.) He recalls that Plaintiff had stopped the truck and was outside trying to open the
hood when Cotton noticed the red and blue overhead lights of a police car and thought,
"Oh, shit." He did not see or hear any police officer with Plaintiff. He only recalls seeing
one police officer. He admits that he was highly intoxicated and kept blacking out. (Cotton
Dep. at 48-59, 63-64, 73.) He next recalls waking up in jail. At around 8:00 p.m. on
December 16, 2007, he had sobered up and the police let him go home. He saw Plaintiff
when he was leaving the Taylor police station. Plaintiff was sitting on a bed in a cell with
no shirt on, his face was swollen, the right side of his mid-section was bruised under the
breast area, and Plaintiff yelled to him, "Look what they did to me." The only thing Cotton
heard officers tell Plaintiff was that he wouldn't get a blanket until he let them fingerprint
him. After Cotton left the jail on December 16, 2007, he called Plaintiff's brother Shawn to
let him know that Plaintiff was in the Taylor jail. He also told Shawn that "they beat him up"

because Plaintiff looked like he had been beaten up.  He admitted that he didn't see any contact between Plaintiff and any officer.  (Cotton Dep. at 66-75, 77, 83.)

Defendants have a different version of these events.

Defendant Neidy, who is now retired but was a Taylor police sergeant on December 17, 2007, was the officer who had the initial contact with Plaintiff.  At his deposition, he testified that he had no independent memory of this contact and had to rely principally on his written report.  (Defs.' Mot., Ex. D, Neidy Dep. at 4, 11-12.)  Sgt. Neidy's testified that he had no prior knowledge of Plaintiff or his brother Shawn and that no one addressed Plaintiff as "Shawn" in his presence.  He then described his encounter with Plaintiff in the early morning on December 16, 2007.

It was about 1:30 in the morning.  It was a blinding snowstorm with about 14 inches of snow on the ground.  Sgt. Neidy was in his patrol car near Champagne Street.  He saw a black pickup truck doing doughnuts in the middle of the intersection and headed in its direction.  The black pickup truck picked up speed, going approximately 40-plus miles an hour in a 25 mile-per-hour zone, running about six stop signs, trying to evade Sgt. Neidy. The pickup turned on Polk Street, and Sgt. Neidy turned on his lights to initiate a traffic stop.  As Sgt. Neidy approached the black pickup truck, he reported to dispatch that he was initiating a traffic stop.   Sgt. Neidy then saw the black pickup turn from Polk Street onto Harding, saw the lights on the vehicle turn off, saw it park in the middle of the street, and then saw the driver immediately exit the pickup truck and start running away.  Sgt. Neidy had just parked his scout car about a car's length away from the pickup truck and was reporting to dispatch his location and the license plate of the vehicle when he saw the driver exit the pickup truck and run away.  Sgt. Neidy did not give chase.  Rather, he reported

8

over his radio that he had a fleeing suspect on foot and gave the general direction that the suspect was going. That was the last contact Sgt. Neidy had with Plaintiff. (Neidy Dep. at 13-19.) After Plaintiff ran, Sgt. Neidy reported to dispatch a description of the fleeing suspect. (Neidy Dep. at 26.) He described the suspect as a white male with a black jacket and a watch cap. A LEIN check of the vehicle found it to have an improper plate. The plate on the vehicle was registered to Plaintiff for a 2002 Nissan. The black pickup was registered to Plaintiff's sister, Veronica Phillips, and no plate was assigned to that vehicle. LEIN also showed that Plaintiff had a warrant for his arrest out of Dearborn for driving without a license. (Defs.' Mot., Ex. B, Investigator's Rept. at 1.)

Sgt. Neidy heard over the radio about the police chase and apprehension of Plaintiff in the area of William and Hayes Streets. At that time, Sgt. Neidy was dealing with the passenger in the black pickup, Christopher Cotton. After Plaintiff fled, Sgt. Neidy approached the driver's side of the vehicle with his weapon drawn. The door was still open. It was then that he first realized there was a passenger sitting in the vehicle. He had his hands up. He also had an open beer between his legs. Sgt. Neidy ordered him out of the pickup truck, but he had to go around and open the door for Mr. Cotton, telling him to keep his hands where they could be seen. Mr. Cotton complied, and was arrested for carrying an open intoxicant in a vehicle. Sgt. Neidy does not recall any other conversation with Mr. Cotton. He handcuffed Mr. Cotton and put him in the back of his patrol car. He then stayed on the scene until a tow truck came for the pickup truck, and another officer transported Mr. Cotton to the Taylor police station. (Neidy Dep. at 19-25.)

Sgt. Neidy then went to the Taylor police station to write his report about the incident. His report stated that he had observed Plaintiff commit the following offenses: reckless

9

driving, driving with a suspended license - second offense, driving without vehicle insurance in an unregistered vehicle with an improper plate. (Neidy Dep. at 20.) He did not see Plaintiff when he returned to the Taylor police station, but did learn from other officers that Plaintiff had fought with the officers attempting to apprehend him and then ran, and that Plaintiff had suffered a minor injury because he fell. (Neidy Dep. at 26-30.)

Officer Thivierge was on road patrol on December 16, 2007. He testifies that he was the officer that first apprehended Plaintiff after he fled from Sgt. Neidy's traffic stop. Before that date, he did not know Plaintiff or his brother Shawn, and did not hear anyone call Plaintiff "Shawn" on December 16, 2007. (Defs.' Mot., Ex. F, Thivierge Dep. at 4-5, 7.) In the early morning hours of December 16, 2007, he was in the passenger seat in a patrol car driven by Corporal Yobak. They heard Sgt. Neidy's transmission to dispatch that he had a fleeing suspect after a traffic stop. They went to the area and started looking for the fleeing suspect. They were in the patrol car, had observed foot tracks in the snow, and then sighted Plaintiff run across Harding in the area of Harding and Hayes. Driving in the patrol car, they closed the gap between themselves and Plaintiff. Because Plaintiff was on foot and running through back yards, the officers started pursuing Plaintiff on foot. They yelled to Plaintiff several times, "Stop, it's the police." He did not stop. (Thivierge Dep. at 11-14.)

Ultimately the officers got close to Plaintiff. Officer Thivierge was coming out of a back yard on the east side of William Street and Plaintiff was coming back into that yard. Plaintiff saw Officer Thivierge near the back of the fence when he was at the front gate. At that point, Plaintiff turned and took off, continuing to flee from Officer Thivierge even though he was ordering Plaintiff to "Stop, it's the police." As Plaintiff got to the street, he was looking

10

back and probably didn't see the snow-covered curb and fell in the street.  Once Plaintiff fell, Officer Thivierge was able to reach him.  Officer Thivierge did not know whether Plaintiff was armed, but assumes in a police chase that every suspect is armed.  He wasn't close enough to Plaintiff during the foot chase to conclude whether he was armed.  However, after he reached Plaintiff and they began to struggle, and Plaintiff continued to reach for his waistband, Officer Thivierge assumed that he was armed.  (Thivierge Dep. at 14-15.)

As Officer Thivierge approached Plaintiff, he started to get back up from his knees. He was not up all the way when he took a swing at Officer Thivierge, who was able to shove him back to the ground.  It was slippery, and this may have helped Plaintiff's fall to the ground on his side.  Officer Thivierge ordered him to put his hands behind his head. Plaintiff did not comply.  They struggled.  Plaintiff was actively trying to get away from Officer Thivierge, trying to push off the ground, trying to push the officer back.  Plaintiff was now face down on the ground.  Officer Thivierge ordered Plaintiff to put his hands behind his back.  Again, he did not comply.  Instead, he kept reaching underneath his body. Officer Thivierge gave Plaintiff several open-hand stuns to the shoulder and head area, trying to subdue him.  He did not hit Plaintiff in the nose because Plaintiff's face was down away from him.  He noticed blood in the snow but did not observe an injury to Plaintiff's nose.  After Corporal Yobak arrived, he and Officer Thivierge got Plaintiff's left hand cuffed. But, Plaintiff kept trying to reach his right hand underneath his body towards his waistband, and Officer Thivierge gave Plaintiff several knee strikes on his backside to stop him. (Thivierge's Dep. at 15-18; Defs.' Mot., Ex. B, Investigator's Rpt. at 1.)

11

Officer Thivierge kept Plaintiff on the ground after both his hands were cuffed because he was still struggling and trying to pull away. After Plaintiff was handcuffed, Officer Thivierge did not strike him. He kneeled on the ground by Plaintiff while his partner, Corporal Yobak, tried to figure out what street they were on. Plaintiff did not make any sounds as if he were in pain, and Officer Thivierge does not recall any conversation with him. After backup arrived and transported Plaintiff to the Taylor police station, Officer Thivierge had no further contact with him. He did not see Plaintiff when he went back to the police station to prepare his report. (Thivierge's Dep. at 18-21.)

Corporal Yobak testified that he chased Plaintiff on foot, but it was Officer Thivierge who actually apprehended Plaintiff. They were not together and took two completely different paths when chasing after Plaintiff. (Defs.' Mot., Ex. G, Yobak Dep. at 9, 13.) He was several houses away from them when he saw Officer Thivierge closing in on Plaintiff. As Corporal Yobak was running toward Officer Thivierge and Plaintiff, he heard Thivierge screaming at Plaintiff several times, "Stop, you're under arrest." Yobak saw Plaintiff fall off the snow-covered curb into the street on his face. The turf and the pavement were very slippery. After Plaintiff fell, Officer Thivierge reached and tried to apprehend him. Plaintiff was resisting, struggling with Officer Thivierge, trying to get up from the ground. Yobak does not recall seeing any blows or attempted blows between the two. He did not see Officer Thivierge hit or kick Plaintiff. Once Yobak reached the two, he attempted to assist Officer Thivierge by grabbing Plaintiff's hands. Plaintiff was still fighting, resisting. Eventually, they were able to handcuff Plaintiff. Corporal Yobak noticed that Plaintiff had a bloody nose. He doesn't recall seeing blood on Plaintiff's face but did see blood in the snow. He denied he caused Plaintiff's bloody nose. During the struggle with Plaintiff, he

12

denied having any physical contact with Plaintiff that could have caused that or any other injury.  He did not see Officer Thivierge do anything that could have caused an injury to Plaintiff's nose.  And, he does not recall pepper spray being used that night.  (Yobak Dep. at 11-17, 19. 25, 27-28.)

After Plaintiff was handcuffed, Corporal Yobak left the scene, looking for a street sign so he could identify their location.  Once he could, he used his body radio to report the location of Plaintiff's arrest.  Other officers arrived within less than 15 minutes and transported Plaintiff to the Taylor police station.  Corporal Yobak got a ride back to his patrol car, and returned to the Taylor police station.  Officer Thivierge prepared the arrest report.  Corporal Yobak does not recall seeing Plaintiff again on December 16, 2007.  He did not know Plaintiff or Shawn Phillips before that date and did not hear anyone call Plaintiff "Shawn" or say, "This is for your brother" or similar words on December 16, 2007. (Yobak Dep. at 19-30.)

Defendant Catherine Wright-Volante is a public service officer employed by the Taylor Police Department and was working in the jail on December 16, 2007.  Her duties include intake and booking of prisoners.  (Defs.' Mot., Ex. I, Wright-Volante Dep. at 4-6.)  On December 16, 2007, she was working the day shift and arrived at 8:00 a.m.  She took Plaintiff's mug shot and prepared and printed out the computer-generated medical screening questionnaire that Plaintiff signed on December 16, 2007 at 1:58 p.m. (Wright-Volante Dep. at 6, 29; Defs.' Mot., Ex. J, Questionnaire.)  The Questionnaire, under "Comments" notes that Plaintiff was "Highly intoxicated on Intake" and "Uncooperative on Intake." (Ex. J, Questionnaire at 1.)  PSO Wright-Volante testified that this is not something

13

she observed but rather those comments would have been passed on to her from the earlier shift.  (Wright-Volante Dep. at 27-29.)

The Questionnaire asks "Are you in pain right now?;" "Obvious injuries, bleeding or need for emergency care?;" "Swelling, bruises or other signs of trauma?" and "Do you require immediate medical treatment?"   On the printed form that Plaintiff signed, each is answered "No."  (Ex. J, Questionnaire at Nos. 1, 34, 35, 42.)  PSO Wright-Volante testified that Plaintiff answered these questions "No."  Moreover, if he had said he needed medical attention, she would have noted that on the Questionnaire.  She also testified that she did not mark "Yes" on the questions about obvious injuries or signs of trauma because, from her observations of Plaintiff, the mark on his nose as well as any other swelling or bruising was not severe enough to require immediate medical attention or hospital care.  PSO Wright-Volante also testified that she asked Plaintiff whether he wanted medical treatment, and he said "No."  She also gave him another opportunity to change that answer when she told him to read over the Questionnaire, told him to tell her if he wanted to change any of the answers, and told him to tell her anything else before he signed the Questionnaire. Plaintiff signed the Questionnaire with the "No" answers.  (Wright-Volante Dep. at 30-32, 46-52.)

PSO Wright-Volante was not present when EMS was called to the jail to evaluate Plaintiff.  Nonetheless, she was asked generally about the procedure followed when EMS is called to the jail to provide medical attention to a prisoner and recommends that the prisoner be taken to the hospital for further treatment.   She responded that EMS recommends that everyone be transported to the hospital to preclude liability on their part if the prisoner is not transported.  EMS presents the recommendation to the shift supervisor

who then makes an independent evaluation and determines whether or when the prisoner will be transported.  Occasionally, the supervisor will deny immediate transport.  PSO Wright-Volante has no input or responsibility in that area and cannot speak to what the supervisor takes into consideration.  She does not assume anything.  Rather, it's an order from her superior, and if the supervisor says don't send them, she does not do so.  She doesn't question her supervisor's decision.  (Wright-Volante Dep. at 31-40, 43-44.)

Plaintiff filed his original complaint on December 16, 2010, three years after the incident that gave rise to his lawsuit.  His second amended complaint was filed on February 14, 2012.

## II.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

### A. The Statute of Limitations Bars Plaintiff's Claims Against Defendants Tonge, Zieleniewski, Cullen, Culp, KronexI, Anthony, Schindler, Witherspoon, and Michowski

Plaintiff's second amended complaint was filed on February 14, 2012, adding nine new Defendants in place of previously unknown "John Doe" Defendants -- Defendants Lt.

16

Tonge, Lt. Zieleniewski, Sgt. Cullen, Sgt. Culp, Sgt. Kronexl, Sgt. Anthony, Sgt. Schindler, Sgt. Witherspoon and Cpl. Michowski [27]. Defendants argue that Plaintiff's claims against these nine new Defendants are time-barred under the relevant statute of limitations. Plaintiff argues that Rule 15(c) of the Federal Rules of Civil Procedure allows his amendment adding these nine new Defendants to relate back to the December 16, 2010 date of his original complaint. In light of prevailing Sixth Circuit law, this Court rejects Plaintiff's argument. *See Smith v. City of Akron*, 476 F. App'x 67 (6th Cir. 2012).

The statute of limitations for § 1983 claims is the state statute governing personal injury. *Wilson v. Garcia*, 471 U.S. 261, 272 (1985). In Michigan, "the period of limitations is 3 years after the time of . . . injury for all actions to recover damages for . . . injury to a person or property." Mich. Comp. Laws § 600.5805(10). Since Plaintiff's second amended complaint adding these nine new Defendants was filed more than four years after his December 16, 2007 arrest and injuries, all claims against these Defendants are time barred unless they relate back to the original complaint. *See* Fed. R. Civ. P. 15(c)(1)(C).

In *Smith v. City of Akron*, the Sixth Circuit addressed procedural facts substantially similar to those presented here. One difference is that Ohio's two-year statute of limitations rather than Michigan's three-year limitations period was at issue in *Smith*.

There, the plaintiff filed a complaint in an Ohio state court two years after his August 27, 2007 arrest alleging excessive force by unnamed arresting officers and "claiming violations of the federal constitution and state tort law by 'John and Jane Doe Nos. 1-10,' the City of Akron, and the Akron Police Department." *Smith*, 476 F. App'x at 68. After the lawsuit was removed to federal court, the plaintiff amended his complaint to add Ross and

17

Miles, the arresting officers, "as defendants in place of 'John Doe' numbers one and two." *Id.* Like the newly added Defendant officers in this case, the arresting officers in *Smith* "moved to dismiss the claims against them because Smith added them after the two-year statute of limitations had expired." *Id.* The district court agreed with the defendant officers "reasoning that Smith's amendment did not 'relate back' to his original complaint." *Id.* (citing Fed. R. Civ. P. 15(c)). After granting the defendant officer's motions, the district court also granted summary judgment to the city defendants. *Id.* The plaintiff appealed, and the Sixth Circuit addressed the precise issue this Court is presented with here -- whether Plaintiff's amendment adding names in place of previously unnamed "John Doe" Defendants relates back to his original complaint under Rule 15(c) -- holding that it does not. *Id.* at 69. The same analysis and result apply here.

An amended complaint that arises out of the same conduct described in the original complaint but changes a defendant "relates back if the new defendant '(i) received such notice of the action that [he] will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against [him], but for a mistake concerning the proper party's identity." *Id.* (citing Fed. R. Civ. P. 15(c)). Moreover, "[a] defendant's actual knowledge of the complaint and constructive knowledge that the plaintiff made a mistake in failing to name him must occur within 120 days of the filing of the original complaint." *Id.* (citing Fed. R. Civ. P. 4(m); Fed. R. Civ. P. 15(c)).

Similar to the plaintiff in *Smith*, Plaintiff here argues that the newly added Defendants "knew about the complaint soon after he filed it and should have known" that Plaintiff intended to sue them. *Id.* Just as the Sixth Circuit observed in *Smith*, even if this is true

Plaintiff must also satisfy "another prerequisite of Rule 15(c) -- that [the plaintiff] made a

"'mistake concerning the proper party's identity.'"  *Id.* (citing Fed. R. Civ. P. 15(c)(1)(C)(ii)).

Plaintiff cannot satisfy that prerequisite for the same reason the plaintiff in *Smith* could not

-- Plaintiff did not make a mistake about the parties he intended to sue; rather, he failed to

find out who they were within the relevant limitations period.  As the Sixth Circuit explained:

> The problem with [the plaintiff]'s amended complaint is that adding new, previously unknown defendants in place of "John Doe" defendants "is considered a change in parties, not a mere substitution of parties," and "such amendments do not satisfy the 'mistaken identity' requirement of Rule 15(c)[ ]."  *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996).  [The plaintiff] did not make a mistake about the identity of the parties he intended to sue; he did not know who they were and apparently did not find out within the two-year limitations period. The relation-back protections of Rule 15(c) were not designed to correct *that* kind of problem.

*Id.* (citations omitted).

Application of the Supreme Court's decision in *Krupski v. Costa Crociere S.p.A.*, 560

U.S. ___, 130 S. Ct. 2485 (2010), does not require a different conclusion.  As the *Smith*

court observed, "Krupski's problem is not Smith's problem."  *Smith*, 476 F. App'x at 69.  The

same is true here -- Krupski's problem is not Phillips's problem.  In *Krupski*, "the plaintiff

knew of two potential parties when she filed the lawsuit, but she sued the wrong party and

corrected the mistake only after the statute of limitations had expired."  *Id.* (citing *Krupski*,

130 S. Ct. at 2490-92).  Smith and Plaintiff Phillips here, on the other hand, "did not make a

mistake about which defendant to sue; [they] simply did not know whom to sue or opted

not to find out within the limitations period."  *Id.* (citations omitted).  Similar to the plaintiff

in *Smith*, Plaintiff here waited until the last day of the relevant limitations period to file his

complaint and "left no time to discover the identity" of the officers he should sue "within the

relevant time." *Id.* As the Sixth Circuit observed, "[e]ven after *Krupski*, Rule 15(c) offers no remedy for this problem." *Id.* Furthermore, this approach "is consistent with the holdings of every other circuit on this issue." *Id.* at 69-70 (listing cases). Accordingly, Plaintiff's claims against Defendants Tonge, Zieleniewski, Cullen, Culp, Kronexl, Anthony, Schindler, Witherspoon, and Michowski are dismissed with prejudice because they are time-barred under Michigan's three-year statute of limitations.

### B. Claims of Unreasonable Seizure, Detention, and Excessive Force

Plaintiff alleges claims of unreasonable seizure, detention and excessive force against all Defendants except Defendant Catherine Wright-Volante. Plaintiff does not claim that he was arrested without probable cause.[2] Rather, his Fourth and Fourteenth Amendment claims are based on allegations and arguments that Defendants Neidy, Thivierge, and Yobak used excessive force on him on December 16, 2007, and that Defendant Neidy and the nine newly named Defendant officers unreasonably detained him in the Taylor jail for a period in excess of 72 hours before arraigning him. The unreasonable detention claims are addressed first.

### 1. Unreasonable Detention Claims are Dismissed

---

[2]Indeed, any such argument would be rejected in light of the Supreme Court's decision in *Devenpeck v. Alford*, 543 U.S. 146, 155 (2004) (holding that there is no Fourth Amendment violation even if the police officer does not have probable cause for the specific offense charged as long as the arresting officer has probable cause to make an arrest for any violation), and Plaintiff's admissions that the vehicle he was driving had an improper plate, that he was driving without a valid license, and because there was a warrant out for his arrest. *See also Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal quotation marks and citations omitted) (observing that "[a] police officer determines the existence of probable cause by examining the facts and circumstances within his knowledge that are sufficient to inform a prudent person, or one of reasonable caution, that the suspect has committed, is committing, or is about to commit an offense.")

First, in light of the Court's ruling above, Plaintiff's claims against the nine newly added Defendant officers are time-barred and dismissed with prejudice. Thus, the only Defendant remaining on these claims is Defendant Neidy. Plaintiff's claims against Defendant Neidy are also dismissed with prejudice.

The Sixth Circuit has observed that "[e]ach defendant's liability must be assessed individually, based on his or her own actions." *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008) (citing *Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984)). Moreover, "only officers with direct responsibility for the challenged action may be subject to § 1983 liability." *Wilson v. Morgan*, 477 F.3d 326, 337 (6th Cir. 2007) (citing *Ghandi*). Here, there is no evidence that Defendant Neidy had any direct involvement in the length of Plaintiff's pretrial detention at the Taylor jail. Accordingly, Plaintiff's claims against him related to that detention are dismissed with prejudice.

The Court now addresses Plaintiff's claims of excessive force alleged against Defendants Neidy, Thivierge, and Yobak.

### 2. Plaintiff's Claims of Excessive Force

#### a. Plaintiff's Excessive Force Claims Against Defendants Neidy and Yobak are Dismissed

As observed above, "[e]ach defendant's liability must be assessed individually, based on his or her own actions." *Dorsey*, 517 F.3d at 399 n.4. Accordingly, this Court's task is to individually evaluate Sgt. Neidy's, Officer Thivierge's, and Corporal Yobak's conduct "under the Fourth Amendment's 'objective reasonableness' standard." *Roberts v. Manigold*, 240 F. App'x 675, 677 (6th Cir. 2007) (quoting *Brosseau v. Haugen*, 543 U.S.

21

194, 197 (2004)).  Under the Fourth Amendment, a police officer may use only such force as is objectively reasonable under the circumstances.  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  Determining whether there has been a Fourth Amendment violation requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396.  "This is not an 'exhaustive list' and the inquiry ultimately turns on whether the seizure was reasonable under the 'totality of the circumstances.'"  *Bozung v. Rawson*, 439 F. App'x 513, 519 (6th Cir. 2011) (citing *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008)).  "The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.'"  *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).  The reasonableness of the use of force is not judged from the subjective perspective of the plaintiff.  *Goodrich v. Everett*, 193 F. App'x 551, 555 (6th Cir. 2006) (citing *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004)).

### i.  Defendant Neidy

Although Plaintiff's version of events differs from that of Sgt. Neidy, the Court finds that Plaintiff has not established a genuine issue of material fact regarding whether Sgt. Neidy used excessive force.  Viewing the facts in the light most favorable to Plaintiff, judging the lawfulness of Sgt. Neidy's conduct from the perspective of a reasonable officer on the scene, and applying the above three *Graham* factors, Sgt. Neidy's physical contact with Plaintiff was objectively reasonable under the circumstances.  Although Sgt. Neidy was

performing a traffic stop, Plaintiff testified that, despite Sgt. Neidy's commands otherwise, he removed his hand from the hood of the pickup truck and reached toward his back pocket right before Sgt. Neidy pushed his head on his hood with his open palm and started sprayed him with mace. Plaintiff then turned his head toward Sgt. Neidy, moved his hands to cover his face, and heard Sgt. Neidy telling him not to resist. Plaintiff then took off running. All this took about 30 seconds. Because a reasonable officer in Sgt. Neidy's position would have interpreted Plaintiff's actions as an attempt to resist, evade, or impede an arrest and would have feared for his safety in light of Plaintiff's reaching toward his back pocket area, it was reasonable for Sgt. Neidy to use his open palm to push Plaintiff's head on the hood of the pickup and to use a chemical spray to try and subdue him. Plaintiff's excessive force claims against Defendant Neidy are dismissed. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citation omitted).

### ii. Defendant Yobak

Although Plaintiff's version of events also differs from that of Corporal Yobak, the Court finds that Plaintiff has not established a genuine issue of material fact regarding whether Corporal Yobak used excessive force. Viewing the facts in the light most favorable to Plaintiff, judging the lawfulness of Corporal Yobak's conduct from the perspective of a reasonable officer on the scene, and applying the above three *Graham* factors, Corporal Yobak's physical contact with Plaintiff was objectively reasonable under the circumstances. Examination of Defendants Thivierge's and Yobak's deposition testimony reveals that it was Officer Thivierge who apprehended Plaintiff. By the time Corporal Yobak reached Plaintiff,

he and Officer Thivierge were on the ground struggling.  Corporal Yobak assisted Officer Thivierge in getting Plaintiff handcuffed.  He denies that he had any physical contact with Plaintiff that could have caused his injuries.  Plaintiff does not testify to the contrary.

Plaintiff does not dispute that, just prior to Defendant Yobak's contact with him, he had been fleeing from the police, ignoring repeated commands telling him, "Stop, it's the police." He cannot identify whether it was Defendant Thivierge or Defendant Yobak that had physical contact with him.  He does admit, however, that he was actively moving around while on the ground and moving his hands from his side to the front of his body and that the police were telling him to quit resisting.  He testified that this struggle with the police in the snow-covered street lasted around 30 seconds.  He concedes that, after he was handcuffed, no officer kicked, punched, slapped, or pushed him.  (Pl.'s Dep. at 182-198.) Viewed from the perspective of a reasonable officer on the scene, Plaintiff's conduct would give rise to a reasonable conclusion that this fleeing suspect was continuing to resist, impede, or evade his arrest.  Moreover, because he was a fleeing suspect, a reasonable officer would fear for his safety.  Accordingly, any physical contact Corporal Yobak had with Plaintiff while assisting Officer Thivierge in handcuffing him was reasonable under the circumstances.  Accordingly, Plaintiff's excessive force claims against Corporal Yobak are dismissed.

### b.  Genuine Issue of Fact Remains on Plaintiff's Excessive Force Claim Against Defendant Thivierge Alleging a Kick to His Ribs and Stomach While He Was Being Compliant

Plaintiff's and Officer Thivierge's versions of his December 16, 2007 seizure are vastly different.  Officer Thivierge testified that, after pursuing Plaintiff through snow-covered

residential yards, he and Plaintiff spotted each other.  Plaintiff continued to run despite commands to stop, got to the street, looked back, and likely didn't notice the snow-covered curb and fell into the street on his knees.  After Officer Thivierge reached Plaintiff in the street, Plaintiff started to get up off his knees, and took a swing at him.  Officer Thivierge was able to shove Plaintiff to the ground, likely with the assistance of the slippery, snow-covered street.  Officer Thivierge ordered Plaintiff to put his hands behind his head, but he did not comply.  They struggled.  Plaintiff was actively trying to get away from him.  Plaintiff was now face down on the ground, and Officer Thivierge ordered him to put his hands behind his back, but he did not comply.  During this time, Plaintiff was reaching for his waistband underneath his body, and Officer Thivierge assumed Plaintiff was armed.  Officer Thivierge gave Plaintiff several open-hand stuns to the shoulder and head area, trying to subdue him, but denies he hit Plaintiff in the nose because his face was down away from him.  After Corporal Yobak arrived, he and Officer Thivierge got Plaintiff's left hand cuffed, but he kept trying to reach his right hand underneath his body towards his waistband, and Officer Thivierge gave Plaintiff several knee strikes on his backside to stop him.  After Plaintiff was handcuffed, Officer Thivierge kneeled on the ground by Plaintiff while Corporal Yobak left to find out what street they were on.   Plaintiff was still struggling and trying to pull away.  (Thivierge's Dep. at 15-21.)

Plaintiff admits that he was being chased by an officer for about 10 to 15 minutes through snow-covered streets, front and back yards, and hopping fences despite hearing the police yell to him to stop.  When he reached Campbell Street and was coming off the sidewalk, he saw two police cars approaching so he stopped in the middle of the street,

25

dropped to his knees, and put his hand on the top of his head.  (Pl.'s Dep. at 177-182, 184-86.)  Two officers from one police car approached Plaintiff.  One officer walked up and kicked him once on the right side of his ribs.

Plaintiff fell to his side, removed his hands from his head and curled up like a ball to protect himself.  One of the officers then kicked him a second time in the stomach and he had a bowel movement.  He testifies that an officer or officers then used their hands and feet to punch him in the back of the head and to kick him in the upper torso, stomach, side and back about three to five times.  One officer also put a boot on the side of his face and would not let him up.  Despite hearing the officers tell him to quit resisting, Plaintiff admits that he moved from his knees to laying on the ground on his side and moving his hands from the side to the front of his body.  He also admits that after he was handcuffed, no officer kicked, punched, slapped, or pushed him.

Viewing the facts in the light most favorable to Plaintiff, judging the lawfulness of Officer Thivierge's conduct from the perspective of a reasonable officer on the scene, and applying the above three *Graham* factors, questions of fact exist regarding whether Officer Thivierge's initial contact with Plaintiff -- the initial kick to the ribs while in the street on his knees with his hands on his head and the second kick to the stomach after he removed his hands from his head and curled up like a ball -- was objectively reasonable under the circumstances.  Applying the above standards to the Officer's subsequent physical contact after these initial two kicks, this Court finds that Officer's Thivierge physical contact with Plaintiff after this point was objectively reasonable under the circumstances.  It is not disputed that Officer Thivierge had very limited knowledge about Plaintiff other than he was

a fleeing suspect who had ignored repeated commands to "Stop, it's the police." Moreover, Plaintiff admits that, during the 30 second struggle before he was handcuffed, he was actively moving around while on the ground and moving his hands from his side to the front of his body and that the police were telling him to quit resisting. Viewed from the perspective of a reasonable officer on the scene, Plaintiff's conduct would give rise to a reasonable conclusion that this fleeing suspect was continuing to resist, impede, or evade his arrest. Moreover, because he was a fleeing suspect, a reasonable officer would fear for his safety. Accordingly, although genuine issues of material fact exist for trial on Plaintiff's excessive force claim against Officer Thivierge with regard to the initial kicks to the ribs and stomach, all remaining claims of excessive force against Officer Thivierge are dismissed. *See Bozung*, 439 F. App'x at 520-21. Furthermore, as to the limited excessive force claims against Officer Thivierge that survive summary judgment, Officer Thivierge is not entitled to qualified immunity. The facts, taken in the light most favorable to Plaintiff, would permit a finding that the force Officer Thivierge allegedly used, i.e., a kick to the ribs when Plaintiff was on his knees with his hands on his head and a kick to the stomach when Plaintiff was curled over from the initial kick, would have been recognized by a reasonable officer in his position to be unnecessary if Plaintiff was not resisting. Finally, this alleged conduct occurred at a time when the right to be free from excessive force was clearly established.

The Court now considers Plaintiff's claim of deliberate indifference to his serious medical needs.

### 3. Plaintiff's Claims of Deliberate Indifference to Serious Medical Needs Are Dismissed

27

Plaintiff claims that Defendants Wright-Volante, Neidy, Tonge, Zieleniewski, Cullen, Culp, Kronexl, Anthony, Schindler, Witherspoon, and Michowski violated his Fourth and Fourteenth Amendment rights by being deliberately indifferent to his serious medical needs and subjecting him to cruel and unusual punishment. Defendants are entitled to summary judgment on these claims. First, as discussed above, all claims against Defendants Tonge, Zieleniewski, Cullen, Culp, Kronexl, Anthony, Schindler, Witherspoon, and Michowski are time-barred. Second, Plaintiff presents no evidence that Defendant Neidy had any contact with or any responsibility over his medical or other needs once he was taken into custody and transported to the Taylor jail. Finally, in light of Plaintiff's signature on the medical screening questionnaire prepared by Public Service Officer Wright-Volante denying the need for immediate medical treatment and her testimony that, based on her observations of Plaintiff, she did not believe that the mark on his nose or any other swelling or bruising he exhibited was severe enough to require immediate medical attention or hospital care, Plaintiff cannot establish a claim of deliberate indifference against her.[3] Moreover, PSO Wright-Volante testified that the supervising officer would determine whether and when a pretrial detainee would be transported to the hospital for medical attention; she did not make the decision and had no authority or responsibility in that area. Finally, as to Plaintiff's remaining claims about his alleged mistreatment while in the Taylor jail, he fails to present any evidence that Defendant Wright-Volante was responsible for or could be held liable for the alleged mistreatment. Accordingly, Plaintiff's claims against Defendant Wright-Volante are dismissed.

---

[3]Plaintiff presents no evidence to support his claim that PSO Wright-Volante falsified this form, and Plaintiff's signature on the form refutes this claim.

Plaintiff cannot establish the required subjective component of the requisite "deliberate indifference" test.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (observing that "the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, <u>and he must also draw the inference.</u>") (emphasis added). "Deliberate indifference is characterized by obduracy or wantonness -- it cannot be predicated on negligence, inadvertence, or good faith error."  *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012).  The essence of Plaintiff's argument is that PSO Wright-Volante should have known that Plaintiff required immediate medical attention for his face and ribs. As the Sixth Circuit observed in *Bruederle*, "that is the language of [negligence], not deliberate indifference."  *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 778 (6th Cir. 2012) (citing *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001)).

### 4.  Plaintiff's Civil Conspiracy Claims Are Dismissed

Finally, Plaintiff alleges that Defendants Neidy, Tonge, Zieleniewski, Cullen, Culp, Kronexl, Anthony, Schindler, Witherspoon, Michowski, and Wright-Volante conspired to violate his Fourth and Fourteenth Amendment rights, in violation of 42 U.S.C. §§ 1985 and 1986, in refusing to acknowledge that Plaintiff required immediate medical attention, refusing to allow him to see his family or attorney, refusing to give him clean clothes, refusing to give him adequate blankets, refusing him his shirt and shoes when he was transported to the hospital, and refusing to fill a prescription for pain pills.  (Pl.'s 2d Am. Compl., ¶¶ 66, 76.)  This Court agrees with Defendants -- Plaintiff has not presented any evidence that the non-time-barred Defendants -- Defendants Neidy or Wright-Volante --

2:10-cv-14982-NGE-MKM   Doc # 53   Filed 11/13/12   Pg 30 of 30   Pg ID 1193

conspired with anyone to deprive Plaintiff of his Fourth and Fourteenth Amendment rights. Accordingly, Plaintiff's civil conspiracy claims are also dismissed.

## IV.  Conclusion

For the above-stated reasons, Plaintiff's cross-motion for partial summary judgment on his claim of unreasonable seizure [42] is DENIED, and Defendants' motion for summary judgment [40] is GRANTED IN PART and DENIED IN PART.  The only claim remaining for trial is Plaintiff's excessive force claim against Defendant Officer Thivierge alleging that he kicked Plaintiff once in the ribs when he was on his knees with his hands on his head and allegedly kicked him once in the stomach when Plaintiff was curled over from the initial kick. All remaining claims against Defendant Thivierge and all other Defendants are DISMISSED WITH PREJUDICE.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  November 13, 2012


I hereby certify that a copy of the foregoing document was served upon counsel of record on November 13, 2012, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager